**510**

Virgil **KESTER**, Respondent,

v.

Goetze **JETER** and Elizabeth Jeter, husband
and wife, Appellants,

and

Carl Phipps and Ruby A. Phipps, husband
and wife, Defendants.

Nos. 25412, 25413.

Missouri Court of Appeals,
Kansas City District.

April 20, 1972.

Rehearing Denied June 5, 1972.

Arthur M. O'Keefe, Moberly, for appellants.

James J. Wheeler, Keytesville, for defendants.

Clifford A. Falzone, Falzone & Falzone, Moberly, of counsel, for respondent.

PER CURIAM.

Respondent Kester recovered judgment for $8,669.84 for work and materials furnished on a residence at 718 East Logan Street, Moberly, Missouri. The only appeal perfected by the filing of a brief is by the Jeters, and that brief asserts error only in the trial court's failure to enter judgment on Jeters' counterclaim against Kester for $7,300.00 because of his alleged failure to complete the construction contract in a good and workmanlike manner, the issue here under the evidence.

Kester and the Jeters entered into a written contract on February 1, 1966, whereby Kester agreed to remodel the residence "in a careful, professional and workman-like manner and to proceed immediately and promptly to completion within 120 consecutive days, according to plans

attached hereto, made a part hereof and marked Exhibits A & B (Exhibit B, being an enlarged, detailed drawing of the kitchen) all according to the following description." The "description" generally provides for the work to be done and materials to be used for "A. Existing Building"; "B. New addition (Exhibit A)" [a new room]; and "C. General." The contract price was specified at $9,275.00 to be paid in full 30 days after completion.

Concerning the Jeters' claim, their evidence is this: On February 12, 1966, the property was worth $9,000.00 and it had the same value at the time of trial. Kester began work on the property 10 to 15 days after the contract was signed, and Jeter went by the house daily, often twice or three times a day. Up to the middle of June, Jeter saw Kester there regularly every day and occasionally on Saturdays. He saw the plumber there in March and April; a carpenter (Zahner) there one day; the electrician (Freelin) there on two different days; and a Mr. Todd and some workmen. He talked with Kester about the reason for the delay in the progress of the work and in mid April Kester assured him that the total project was half finished, and that he would have a crew of workmen come in for a crash program. At the end of 120 days Jeter reminded Kester that they had come to the end of the contract. Kester acknowledged that he had not finished and asked for an extension of 30 days to bring in crews for the crash program, which request was granted. After mid August, 1966, Jeter continued to go out to the house and never saw Kester there, and he did make efforts to reach him at his home and by phone, but was never able to contact him. Jeter saw no evidence that the work had progressed after that time. On February 6, 1967, the Jeters authorized their counsel to write a letter to Kester that the contract had been terminated by his failure to carry it out, and Kester was directed not to go on the premises unless accompanied by the Jeters or their representative.

Jeter testified that these things in the contract were not performed by Kester: The remaining hardware (door knob) and the threshold were not put on the front door. The dividers or grilles for the Andersen thermopane windows were not installed (Kester said he had not brought them on the premises because they were very fragile). There was a gap in the windows causing the panes to move laterally. The elm weld-wood panelling was installed crooked. Improper baseboards were put in the living room so as to cover up discolored wallboard, instead of using new modern baseboard. The fireplace was not finished, and the chimney was never added to it—a gaping hole was left in the roof above it, which let the rain in. There were two gaping holes in the roof, and one in the foundation on the west side where a similar chimney in the kitchen area had been removed. Patches were put over the roof holes by Jeter. The living room panelling was not put in because part of it was to conceal the fireplace chimney (which in turn was not finished). The louvered bedroom doors were not sanded before staining them, leaving them rough. A clothes pole in a new closet was not erected, the shelf was not secure, and the floor was not tiled. The bathtub was not level, causing a gap in the tile, and the tub would not drain water, but this was corrected. The cabinets in the bath had rough, splintered wood, full of knotholes, some of which had come out. A gap was left between the molding and the wallpaper, and the electrical fittings were not installed in the bathroom. The hot water heater was not vented to the new chimney, and the heater and other fixtures were not connected in the house. A door to the east was not completed, and there were no steps installed there. The dryer was not vented, and storage cabinets were not finished on the inside. The floor tiling in the hallway, the kitchen area, the utility room, the closets of the front bedroom and the new bath was not completed. Tile was also not put on the back porch. Trim was lacking in

several areas, and the trim leading to the front bedroom was split. New electrical outlets were not installed in the walls to replace old floor outlets which were to be removed and the holes plugged up. Lights were never installed in the closets, nor was an outlet in the hallway, and two "eyeball" outlets in the study. No construction work was done in the basement except the removal of part of one wall. The wall cabinets in the kitchen were out of line, and all the knobs were not put on the doors. Outlets at both corners of the counter area were not installed. The plumbing and electrical connections necessary for installation of kitchen appliances were not done. There was no landing or steps installed in the new bath, but just loose pieces of board were put on the steps. The molding of the living room ceiling, and the wallpaper of the living room wall was not put on, nor was that of a portion of the walls of the front bathroom. The hallway and the rear bathroom were not papered. The wallpaper in the kitchen was put on, but it was damaged by rain after Kester left. In the new addition, one Andersen window was of the wrong size, and the thermopane patio door would not open without the greatest difficulty. The new bath walls were not finished with paint, an orange, pumpkin shade, selected by Jeter, and no tile was laid on the floor. The cabinets were to be birch with pine shelving to be installed, but the doors were made of plywood which split and splintered. The ceiling outlet was not in and there was no paint on the closet walls, no light in it, nor tile on the floor.

There was no guttering put on at all on the new addition, and the (ceiling) joists were warped and bent. Kester started of his own accord to finish under the eaves (this was not in the contract) but did not finish it. The old guttering was cut leaving an open end which let water run over the new work, down the foundation and into a trench and into the basement of the house, and Kester did not fix it. A new sewer was not put in, except to start a ditch. No felt paper, as required, was put on the exterior of the new addition. As to the heating system, it was dismantled so work could be done on the plumbing and the fireplace foundation. The pipes were taken out and not replaced, and no cold air return was put into the new addition, and existing registers throughout the house were removed and never put back.

Jeter was ill and away from December, 1966 to April, 1967, and it was his testimony that in January 1967, he visited the property and its condition was the same as in the previous August, the last time he saw Kester, and he saw no work which had been done since August.

On cross-examination Jeter admitted that there were some tools of Kester left on the premises after August, 1966, when he last saw him; a heavy work bench with clutter on it, and some house jacks. He conceded that doors would have to be cut off at the bottom with reference to the thickness of carpeting and pad to be installed, and that no carpeting or pad was supplied Kester. The two chips in the fireplace bricks were small. Jeter never did test the water taps to see if the water was on. The tile under a stationary dishwasher in the kitchen may be omitted as a matter of preference. Jeter admitted that when he visited the property in January, 1967, there had been installed a shower base, a shower, two lavatory faucets, the sink in the kitchen, and two toilets. There was evidence in the case that these items were not delivered to the job until September and October, 1966, and some in January, 1967.

Kester's version of the facts was first, that Jeter prevented him from completing the work within 120 days because Jeter did not cooperate in making decisions, unreasonable demands for perfection; that Jeter agreed to extensions of time of the completion date, and repeatedly told Kester there was no hurry. Banker Mohney testified that he saw Jeter on the street in September, 1966, at which time Jeter told him there was no longer any hurry for the

work to be done. Kester was an experienced general contractor who built several buildings substantial in size and cost in the Moberly area over the past several years. He had been engaged in construction work since he was a mere boy. Kester testified in detail as to his performance of enumerated items in the contract, noting the things which were unfinished up to February 6, 1967. The masonry work on the foundation for the new room and for the fireplace was done by J. V. Todd, who had been a brick mason for 10 years. All that remained to be done to the fireplace was to install a metalbestos chimney, a matter of two or three hours work. The excavation work was done by Ralph Gilbert, who had done that kind of work for 15 years. Gilbert dug a sewer line from the house out to the alley. Fred Freelin, an electrician for about 19 years, did the electrical work. James I. Zahner, a union carpenter since 1941 (who was required by Jeter to be fired by Kester), testified that while he was working, he observed Kester's work, and as to its being done in a workmanlike efficient manner, "It was first class condition, first class." Luther K. Davidson, a part time carpenter, worked on the Jeter home for Kester in the summer or fall of 1966 for two days, and he thought the work he did and that work which had been done was done in a professional workmanlike manner, and that the materials used were of an ordinary customary grade. Ronald W. Wilson was also a carpenter putting on sheetrock at the Jeter house, and he testified also that in furtherance of the remodeling job, the work was done in a professional workmanlike manner.

On the conflicting evidence as above rather detailed, it was for the trial court to judge the credibility of the witnesses and to reach a judgment on the issue based upon that finding. That finding of the court will be deferred to here. Rule 73.01(d) V.A.M.R.; Isaac v. Koenig, Mo. App., 447 S.W.2d 818, 819[1], and cases cited. Added to the testimony of the witnesses is the group of photographs of interior portions of the Jeter property, all of which very obviously show that Kester's work, up to the time he was required to leave the job, was done in a workmanlike manner. Any delay, if that is a part of the Jeters' claim, in the completion of the job, as the court could find under the evidence, was the result of Jeter's acts, his own extensions of time, Moore v. Mc-Cutchen, Mo.App., 190 S.W. 350, 352[7, 8], and his own acquiescence and waiver of the period of time specified in the contract for its completion, Rayburn v. Atkinson, Mo., 206 S.W.2d 512, 516[4–6]. On the whole, the finding of the court is supported by substantial evidence that the Jeters were not damaged as claimed.

The judgment is affirmed.